Slip Op. 21– 47

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| HYUNDAI STEEL CO., | : | |
| Plaintiff, | : | |
| and | : | |
| UNITED STATES STEEL CORP., | : | |
| Consolidated Plaintiff, | : | |
| and | : | |
| NUCOR CORP., | : | **PUBLIC VERSION** |
| Consolidated Plaintiff-Intervenor, | : | Before: Richard K. Eaton, Judge |
| v. | : | Consol. Court No. 19-00099 |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| UNITED STATES STEEL CORP., | : | |
| Defendant-Intervenor, | : | |
| and | : | |
| HYUNDAI STEEL CO., | : | |
| Consolidated Defendant-Intervenor. | : | |

## <u>OPINION and ORDER</u>

[Final Results sustained in part and remanded to Commerce.]

Dated: April 27, 2021

 *J. David Park*, Arnold & Porter Kaye Scholer LLP, of Washington DC, argued for Plaintiff and Consolidated Defendant-Intervenor Hyundai Steel Co. With him on the brief were *Henry D. Almond* and *Daniel R. Wilson*.

 *Elizabeth Speck*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *Brendan Saslow*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

 *Thomas M. Beline* and *Sarah E. Shulman*, Cassidy Levy Kent (USA) LLP, of Washington DC, argued for Consolidated Plaintiff and Defendant-Intervenor United States Steel Corporation. With them on the brief was *Jack A. Levy*.

 Eaton, Judge: Before the court, in this consolidated action,[1] are the motions for judgment on the agency record of Plaintiff and Consolidated Defendant-Intervenor Hyundai Steel Company ("Hyundai"), and Consolidated Plaintiff and Defendant-Intervenor United States Steel Corporation ("U.S. Steel"). By their respective motions, Hyundai and U.S. Steel challenge aspects of the final results of the United States Department of Commerce's ("Commerce" or the "Department") first administrative review of the antidumping duty order ("Order")[2] on cold-rolled steel flat products from the Republic of Korea ("Korea"). *See Certain Cold Rolled Steel Flat Products From the Republic of Korea*, 84 Fed. Reg. 24,083 (Dep't Commerce May 24, 2019) ("Final Results") and accompanying Issues and Decision Mem. (May 17, 2019), P.R. 202 ("Final IDM"). Jurisdiction is found under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018).

---

 [1] On August 22, 2019, the court granted the parties' consent motion to consolidate *United States Steel Corporation v. United States*, Court No. 19-00103, under the lead case, *Hyundai Steel Company v. United States*, Consol. Court No. 19-00099. *See* Order dated Aug. 22, 2019, ECF No. 21.

 [2] On September 20, 2016, Commerce issued an antidumping duty order on cold-rolled steel flat products from Korea following its investigation and final affirmative dumping determination. *See Certain Cold-Rolled Steel Flat Products from Brazil, India, the Republic of Korea, and the United Kingdom*, 81 Fed. Reg. 64,432 (Dep't Commerce Sept. 20, 2016) (amended antidumping duty order).

Hyundai, a Korean producer and exporter of subject merchandise, and a mandatory respondent in the review, contends that Commerce's use of adverse facts available in the Final Results cannot be sustained. *See* Hyundai's Mem. Supp. Mot. J. Agency R., ECF No. 31-2 ("Hyundai's Br."); Hyundai's Reply Br., ECF No. 42; *see also* 19 U.S.C. § 1677e(a)-(b). Hyundai maintains that, contrary to Commerce's findings, it fully and accurately complied with Commerce's requests for information and, to the extent Commerce found a deficiency in the company's reporting (*i.e.*, inconsistencies in reported specification information for U.S. and home market sales), the agency failed to provide Hyundai with notice of the nature of the deficiency and an opportunity to remedy it, prior to resorting to facts otherwise available, as required by the statute.[3] *See* Hyundai's Br. 16; *see also* 19 U.S.C. § 1677m(d). Hyundai further maintains that, even if the use of adverse facts available were justified, Commerce's use was overbroad and arbitrary because the agency disregarded sales for which it found no inconsistencies in reported specification information. *See* Hyundai's Br. 1-2. Hyundai thus asks the court to "remand the agency's determination with instructions to Commerce to correct its errors." Hyundai's Br. 31.

For its part, U.S. Steel, a domestic steel producer, and one of the petitioners below,[4] challenges Commerce's denial of its request to rescind the review with respect to Hyundai's

---

[3]     Commerce must make two separate findings before it may use adverse facts available. *First*, Commerce must find that use of "facts available" is needed because "necessary information is not available on the record," or "an interested party or any other person . . . withholds information that has been requested by [Commerce] . . . [or] significantly impedes a proceeding." 19 U.S.C. § 1677e(a)(1)-(2)(A), (C). *Second*, Commerce must find "that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." *Id.* § 1677e(b)(1). Only at that point may Commerce use an adverse inference "in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1)(A).

[4]     The petitioners are domestic steel producers: Consolidated Plaintiff and Defendant-Intervenor U.S. Steel; Consolidated Plaintiff-Intervenor Nucor Corporation; and non-parties to this action ArcelorMittal USA LLC; AK Steel Corporation; and Steel Dynamics, Inc.

affiliated freight company, Company A,[5] and the assignment of the all-others rate to Company A, as contrary to law, because Company A is neither a producer nor an exporter of subject merchandise. *See* U.S. Steel's Mem. Supp. Mot. J. Agency R., ECF No. 29 ("U.S. Steel's Br."); U.S. Steel's Reply Br., ECF No. 40. In the alternative, U.S. Steel argues that, notwithstanding Company A being neither a producer nor exporter of subject merchandise, Company A should have been collapsed with Hyundai, and assigned Hyundai's adverse facts available rate. Thus, U.S. Steel asks the court to "remand for Commerce to come into compliance with the antidumping statute." U.S. Steel's Br. 21.

Defendant the United States ("Defendant"), on behalf of Commerce, maintains that the Final Results are supported by substantial evidence and otherwise in accordance with law. *See* Def.'s Resp. Opp'n, ECF No. 36 ("Def.'s Br."). U.S. Steel, as Defendant-Intervenor, urges the court to sustain the Final Results with respect to the issues raised in Hyundai's motion. *See* Def.-Int. U.S. Steel's Resp., ECF No. 35. Hyundai, as Consolidated Defendant-Intervenor, urges the court to sustain the Final Results with respect to the issues raised in U.S. Steel's motion. *See* Consol. Def.-Int. Hyundai's Resp., ECF No. 38.

The court finds that Department's use of facts available, under 19 U.S.C. § 1677e(a)[6] based on Hyundai's alleged "withholding" of requested information, cannot be sustained because Commerce failed to comply with its obligation, under 19 U.S.C. § 1677m(d),[7] to notify Hyundai

---

[5]       Company A is [[                                    ]], an affiliated freight company. *See* Hyundai's Sec. A Quest. Resp. (Mar. 8, 2018), C.R. 8, at A-12 to A-13.

[6]       "If . . . an interested party or any other person . . . withholds information that has been requested by [Commerce]," Commerce "shall, *subject to section 1677m(d) of this title*, use the facts otherwise available in reaching the applicable determination under this subtitle." 19 U.S.C. § 1677e(a) (emphasis added).

[7]       Subsection 1677m(d) provides:

of the nature of the alleged deficiency(ies) in Hyundai's questionnaire responses and provide the company an opportunity to remediate. Thus, on remand, Commerce shall reconsider whether the use of facts otherwise available is warranted with respect to any of Hyundai's sales, and adequately explain and support its remand redetermination with substantial evidence. If Commerce determines that the use of facts otherwise available is warranted, and it makes the additional, distinct finding that Hyundai failed to cooperate to the best of its ability, it must adequately explain and support this finding with substantial evidence.

Because the Department found that Company A was neither a producer nor an exporter of subject merchandise during the period of review, and thus did not meet the requirements of 19 U.S.C. §§ 1673b(d) and 1673d(c)(1) for the determination of an antidumping duty rate, the court remands for Commerce to rescind the assignment of the all-others rate to Company A.

The court sustains Commerce's finding that U.S. Steel's request to rescind the review with respect to Company A was untimely, and its decision not to collapse Company A.

---

If [Commerce] . . . determines that a response to a request for information under this subtitle does not comply with the request, [Commerce] . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either—

(1) [Commerce] . . . finds that such response is not satisfactory, or

(2) such response is not submitted within the applicable time limits,

then [Commerce] . . . may, subject to subsection (e), disregard all or part of the original and subsequent responses.

19 U.S.C. § 1677m(d).

## BACKGROUND

On September 1, 2017, Commerce published notice of an opportunity to request an administrative review of the Order. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Admin. Review*, 82 Fed. Reg. 41,595 (Dep't Commerce Sept. 1, 2017). Hyundai submitted its request for review on September 29, 2017. *See* Hyundai's Request for Admin. Rev. (Sept. 27, 2017), P.R. 2.

On October 2, 2017, the petitioners, including U.S. Steel, requested review of several companies, including Hyundai's affiliate, Company A.[8] *See* Pet'rs' Request for Admin. Rev. (Oct. 2, 2017), P.R. 4.

On November 13, 2017, Commerce published notice of the initiation of the first administrative review of the Order. *See Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 82 Fed. Reg. 52,268 (Dep't Commerce Nov. 13, 2017). The period of review was March 7, 2016, through August 31, 2017.

On February 14, 2018, the petitioners timely withdrew their request with respect to all of the companies they had asked Commerce to review, except Company A and POSCO/POSCO Daewoo Corp. ("POSCO/PDW"), a Korean producer and exporter.[9] *See* Letter from Pet'rs to Sec'y Wilber Ross, Jr. (Feb. 14, 2018), P.R. 32.

---

[8]     In addition to Company A, the petitioners requested review of Ameri-Source Korea; Dongbu Steel Co., Ltd.; Dongkuk Steel Mill Co., Ltd.; Dongkuk Industries Co., Ltd.; GS Global Corp.; Hanawell Co., Ltd.; Hankum Co., Ltd.; Hyuk San Profile Co., Ltd.; Kindus Inc.; POSCO; Daewoo International Corp. (which is known as POSCO Daewoo Corp.); Samsung C&T Corp.; Steel N Future; Taihan Electric Wire Co., Ltd.; and Uin Global Co. *See* Pet'rs' Request for Admin. Rev. (Oct. 2, 2017), P.R. 4.

[9]     Because of common ownership, among other factors, Commerce treated POSCO and POSCO Daewoo as a collapsed entity (*i.e.*, POSCO/PDW). *See* Preliminary Decision Mem. (Oct. 3, 2018), P.R. 159 at 7-8. POSCO/PDW is not a party to this action.

Thereafter, the Department selected Hyundai and POSCO/PDW as mandatory respondents, stating they were the two largest producers and exporters of subject merchandise by volume during the period of review.[10] Commerce sent its initial and supplemental questionnaires to each of the mandatory respondents. Both timely filed responses. *See* Commerce's Initial Quest. Secs. A-E (Feb. 8, 2018), P.R. 25 ("Initial Questionnaire"); Commerce's First Suppl. Quest. Secs. A-E (June 18, 2018), P.R. 130 ("Supplemental Questionnaire").

## I.      Commerce's Initial Questionnaire

### A.      Product Codes

In Sections B (home market sales) and C (U.S. sales) of its Initial Questionnaire, Commerce asked for information regarding, *inter alia*, Hyundai's "product codes" for products sold in Korea and the United States during the period of review. A product code is the internal code a company assigns to a product in the ordinary course of its business. *See, e.g.*, Hyundai's Sec. B Quest. Resp. (Mar. 30, 2018), P.R. 82-84 at B-8. Product codes were to be reported in the computer field "PRODCODU/H."[11] These codes were then to be correlated to a matching control

---

[10]      *See* Respondent Selection Mem. (Feb. 8, 2018), C.R. 3, P.R. 24 at 5 ("Based on the [Customs and Border Protection data for entries of cold-rolled steel flat products from Korea during the period of review], we identified the two publicly identifiable exporters/producers with the largest volume of subject imports, which are, in alphabetical order: Hyundai and POSCO."). [[



                                                                          ]] Respondent Selection Mem. at 6.

[11]      The "U" and "H" at the end of a field name, *e.g.*, "PRODCOD" mean, respectively, the United States market and the home market (here, Korea).

number, or CONNUM,[12] that the Department used in the calculation of a dumping margin. Product codes were not, however, used to construct the CONNUMs themselves.

Commerce's instructions did not require Hyundai to use any particular method to report its product codes. Regarding products sold in the home market, the Section B instructions stated: "Report the commercial product code assigned by your company in the normal course of business to the specific product sold." Hyundai's Sec. B Quest. Resp. at B-8. Similarly, regarding products sold in the U.S. market, the Section C instructions stated: "Report the commercial product code assigned by your company in the normal course of business to the specific product sold in the United States." Initial Questionnaire at B-38.

For products that were *further manufactured* in the United States, however, Commerce's Section C instructions provided some additional detail. The instructions stated that if, as in

---

[12]        A CONNUM is a number composed of a series of digits each of which corresponds to a physical characteristic, as defined by Commerce in a questionnaire. For example, here, the components of a CONNUM include eight digits representing: paint, carbon content, quality, yield strength, thickness, width, form, and heat treatment, *e.g.*, 40_1_35_1_22_4_1_1.        Each CONNUM is assigned to a unique product and is "designed to reflect the 'hierarchy of certain characteristics used to sort subject merchandise into groups' and allow Commerce to match identical and similar products across markets." *Manchester Tank & Equip. Co. v. United States*, 44 CIT __, __ n.3, 483 F. Supp. 3d 1309, 1312 n.3 (2020) (quoting *Bohler Bleche GmbH & Co. KG v. United States*, 42 CIT ___, ___, 324 F. Supp. 3d 1344, 1347 (2018)). Commerce has described how it uses CONNUMs to ensure an apples-to-apples comparison of sales made in the home market (or "comparison" market) and those made in the U.S. market:

> [T]he subject merchandise has different CONNUMs to identify the individual models of products for matching purposes. . . . The CONNUMs are assigned to each unique product reported in the sales response. . . . Identical products are assigned the same CONNUM in both the comparison market sales database and U.S. sales database. . . . The matching criteria are used to establish the most similar comparison market product to a given U.S. product.

1 Joseph E. Pattison, Antidumping & Countervailing Duty Laws 837 (2017).

Hyundai's case,[13] "the product sold is further manufactured in the United States, report the product code of the product *sold* not the product *imported*." Initial Questionnaire at B-38 (emphasis added). In its brief before the court, Hyundai indicates that it interpreted this instruction to mean that Commerce was asking for "as sold" product codes in the PRODCOD2U sub-field.[14] *See* Hyundai's Br. 3-4.

### B.    Specification Data

In addition to product codes, Commerce also asked for "specification" data in Sections B and C of its Initial Questionnaire. In this case, specification referred to the type or grade of steel in a product, according to international standards such as those set by ASTM International, a testing and standards organization (*e.g.*, ASTM A653 designation CS Type A). *See, e.g.*, Hyundai's Sec. B Quest. Resp. at B-11. Commerce's instructions for reporting specification in Sections B and C, which were identical, asked Hyundai to "[r]eport the specification/designation/type/grade of the product." *See* Hyundai's Sec. B Quest. Resp. at B-11; Initial Questionnaire at B-39 (same). Specification data was to be reported in the computer field SPECGRADEU/H.

---

13      Hyundai's U.S. affiliate, Hyundai Steel America, Inc. "is a wholly-owned U.S. subsidiary of [Hyundai] and is located in Greenville, Alabama. . . . [D]uring the [period of review], [Hyundai] sold subject merchandise to [Hyundai Steel America], which, in turn, either resold the subject merchandise in its imported condition, or further processed or consumed the merchandise in producing non-subject merchandise prior to reselling the resulting products." Hyundai's Sec. A Quest. Resp. at A-12.

14      Hyundai reported within field 1.0 the "Complete Product Code," which included five sub-fields: Product Type (PRODCOD1U), Specification (PRODCOD2U), Thickness (PRODCOD3U), Width (PRODCOD4U), and Form (PRODCOD5U). *See* Hyundai's Sec. C Quest. Resp. (Mar. 30, 2018), C.R. 130-32, P.R. 82-84 at C-10.

### C.      Hyundai's Reporting of Specification Data for Its U.S. Sales

In its Section C responses, Hyundai reported specification data not only in the SPECGRADEU field (found in Section C, field 2.3), but also as a component of its product code, in the computer sub-field "PRODCOD2U" (found in Section C, field 1.0). Unlike specification data reported in the SPECGRADEU field, however, which Hyundai reported on an "as produced" basis, the specification data in the PROCOD2U sub-field was reported on an "as sold" basis. In other words, in the SPECGRADEU field, Hyundai reported the specification of the product that was produced in Korea by Hyundai and imported into the United States by Hyundai Steel America. In the PRODCOD2U sub-field, Hyundai reported the specification of the product that, in some instances, had been further manufactured by its U.S. affiliate, Hyundai Steel America, and then sold to unaffiliated U.S. customers.

As a result of this difference in reporting method ("as produced" / "as sold"), in some instances the specification data reported in the PRODCOD2U sub-field was not identical to specification data reported in the SPECGRADEU/H and PRODCOD2H fields.[15] In its Section C responses, Hyundai explained its method, stating that it was relying on Hyundai Steel America's U.S. *sales* (*i.e.*, sales made in the United States) invoices as the basis for the specification data reported in PROCOD2U, and Hyundai Steel America's *purchasing* records for specification data reported in SPECGRADEU, *i.e.*, records detailing the company's purchases of product from

---

[15]      In the Final IDM, Commerce does not identify the CONNUMs or individual sales affected by the alleged deficiency(ies). According to U.S. Steel, however, the specification data that Hyundai provided in PRODCOD2U/H did not match the specification data reported in SPECGRADEU/H in seven of eighty-seven instances, impacting individual sales under ten CONNUMs. *See* U.S. Steel's Conf. Resp. Opp'n, ECF No. 34, 5; *see also* U.S. Steel's Pre-Preliminary Cmts. Concerning Hyundai (Sept. 10, 2018), C.R. 313, P.R., 151 at 12.

producer Hyundai.[16] *See* Hyundai's Sec. C Quest Resp. at C-10 ("[Hyundai] reports the following

[product code] information as reflected in the sales invoice."); C-13 (noting that it was reporting

SPECGRADEU "based on [Hyundai Steel America]'s purchasing records."); *see also* Hyundai's

Sec. B Quest Resp. at Ex. B-4 (setting out a table listing all of the reported specifications and

grades, along with the matching QUALITYU code). As requested by Commerce, Hyundai also

reconciled specification information for its reported U.S. sales with the total sales listed in its

financial statements:

> Specifically, where [Hyundai Steel America]'s sales system record is inconsistent
> with the actual specification of the coil in [Hyundai Steel America]'s purchase
> records, Hyundai Steel reviewed the source documentation. If the actual
> specification of the input coil was Hyundai Steel Korea [cold rolled steel flat
> product], Hyundai Steel has added the transactions to the reported sales, and,
> conversely, if the actual specification was not Hyundai Steel Korea [cold rolled
> steel flat product], Hyundai Steel excluded the transactions from the reported sales.

Hyundai's Sec. C. Quest Resp. at C-7. In other words, the specification data for products "as

purchased" and "as sold" did not always match because the specification in Hyundai Steel

America's purchasing records did not always match the specification in its sales invoices, due to,

for example, the further manufacturing of the steel in the United States. Hyundai reconciled its

sales to exclude sales of non-subject merchandise from its reported sales.

It should be noted that, according to Commerce's instructions, neither "product code" nor

"specification" data was used to construct CONNUMs. Put another way, no part of the string of

---

[16]     According to Hyundai, it provided to Commerce "record evidence to explain the
differing specification fields," *e.g.*, "Exhibit C-6-B of [its] initial Section C Questionnaire
Response [provided] explanations for the differing specification fields for [[      ]] [metric tons]
of sales (these instances related to sales where the [SPECGRADEU field] indicated that the
product was subject merchandise, but the 'as sold' specification [*i.e.*, reported in PRODCOD2U]
indicated the product was not subject merchandise)." Hyundai's Br. 28-29. Hyundai's
administrative case brief provided a list of the total sales that had differing fields, which amounted
to [[      ]] metric tons. *See* Hyundai's Case Br. (Nov. 20, 2018), C.R. 344, P.R. 180 at 22 &
Attach. 2.

numbers composing the CONNUM included a digit for the "product code" field or the "specification" field. But specification data was *related to* one of the eight physical characteristics that did compose the CONNUM, *i.e.*, the "quality" element of the CONNUM.[17] *See, e.g.*, Initial Questionnaire at C-1-C-2 (description of QUALITY field identifying, *inter alia*, ASTM standards). That is, as Hyundai describes in its brief, "the SPECGRADEU field related to the specific product produced and exported to the United States, and [Hyundai] therefore used data from that field to identify the QUALITYU code used to construct CONNUMs that it reported in the C database." Hyundai's Br. 15.

Nonetheless, as will be seen, Commerce found that the differences in reported specification data in the product code and specification fields prevented the determination of normal value because, it found that, for some CONNUMs, Commerce could not "match the U.S. sales of these CONNUMs to the appropriate sales in Hyundai's home market database." Final IDM at 13.

## II.   Commerce's Supplemental Questionnaire

On June 18, 2018, Commerce issued a supplemental questionnaire to Hyundai:

> Please ensure that you have accurately reported all *product specifications* in your sales and cost reporting, including whether or not the merchandise is prime or non-prime.[18] Revise your response as necessary.

---

17       Here, the CONNUM for the subject steel products was composed of eight elements, representing the physical characteristics of paint, carbon content, quality, yield strength, thickness, width, form and heat treatment. *See* Initial Questionnaire, fields 3.1-.8. For example, one of the CONNUMs reported by Hyundai was  40_1_35_1_22_4_1_1, where the third number in the sequence,  35, pertained to the physical characteristic "quality." Commerce's questionnaire instructions for reporting quality referred to examples of international industry standards, such as those published by ASTM International. According to the instructions, 35  means "Commercial Steel (*e.g.*, ASTM A1008 designation CS Type A)." *See* Initial Questionnaire at C-1.

18       "'[W]hether or not the merchandise is prime or non-prime' was addressed in field 2.2, 'PRIMEU,' and not PRODCOD2 or SPECGRADE." Hyundai's Br. 6 (citing Hyundai's Sec. C Quest. Resp. at C-12). Apparently, prime merchandise is subject merchandise that is sold in the

Supplemental Questionnaire at 6 (emphasis added). The questionnaire did not inquire about, or even mention, Hyundai's method for reporting product code (PRODCOD2U/H), specification (SPECGRADEU/H), or any perceived discrepancy in the reported data with respect to those fields. It simply asked Hyundai to make sure that the reported data was "accurate."

On July 11, 2018, Hyundai filed its supplemental questionnaire response in which it confirmed the accuracy of the specification information reported in its responses to the Initial Questionnaire:

> No revisions are required. Hyundai Steel reported accurately all product specifications in the sales and cost databases, including whether or not the merchandise is prime or non-prime.

Hyundai's Suppl. Quest. Resp. (July 18, 2018), P.R. 139, C.R. 208, at 12. No additional supplemental questionnaire was issued prior to the issuance of Commerce's preliminary results, almost three months later.

### III.    Commerce's Decision to Use Adverse Facts Available

### A.    Preliminary Results

On October 3, 2018, Commerce published the preliminary results of its review. *See Certain Cold Rolled Steel Flat Products From the Republic of Korea*, 83 Fed. Reg. 51,661 (Dep't Commerce Oct. 12, 2018) ("Preliminary Results"), and accompanying Preliminary Decision Mem. (Oct. 3, 2018), P.R. 159 ("PDM"). Commerce determined that the use of facts available was

---

ordinary course of business, while non-prime or secondary merchandise is material that may result from producing the subject merchandise. *See Corus Staal BV v. United States*, 27 CIT 388, 403-04, 259 F. Supp. 2d 1253, 1267-68 (2003) (discussing non-prime sales). There is no dispute over the reporting of whether the merchandise was prime or non-prime.

warranted under 19 U.S.C. § 1677e(a) with respect to "those sales for which Hyundai reported

contradictory product specification information." *See* PDM at 10. Commerce stated:

> [A]fter examining the manner in which Hyundai reported the product specifications
> for certain CONNUMs in the United States and home market, we have determined
> that Hyundai reported inconsistent product specifications in its home market
> database which is otherwise contradicted by information in Hyundai's U.S. sales
> database. After finding discrepancies with the reported information in Hyundai's
> original questionnaire response, in our June 18, 2018 supplemental questionnaire,
> we instructed Hyundai to "please ensure that you have accurately reported all
> product specifications in your sales and cost reporting, including whether or not the
> merchandise is prime or non-prime. Revise your response as necessary."
>
> However, Hyundai failed to address this deficiency by reporting product
> specification information for some CONNUMs where the home market product
> specification differed from that of the U.S. product specification. Furthermore,
> inconsistencies in Hyundai's product specifications were raised in the investigation
> of this order. We, therefore, find that Hyundai withheld necessary information with
> respect to providing accurate and consistent descriptions of its product
> specifications for all CONNUMs and, thus, failed to cooperate to the best of its
> ability in responding to Commerce's requests for information. Therefore, we find
> that the application of adverse facts available, pursuant to [19 U.S.C. § 1677e(a)-
> (b)], is warranted with respect to those CONNUMs for which Hyundai reported
> contradictory product specification information with regards to its home market and
> U.S. sales.

PDM at 9-10. Thus, Commerce found that Hyundai "[withheld] information that [was] requested

by [Commerce]," 19 U.S.C. § 1677e(a)(2)(A), and "failed to cooperate by not acting to the best of

its ability to comply with a request for information." *Id.* § 1677e(b)(1).

Without further analysis, Commerce proceeded to apply adverse facts available when

determining an antidumping duty margin for Hyundai. Accordingly, Commerce stated, "for those

sales for which Hyundai reported contradictory product specification information, as adverse facts

available, we have assigned the highest calculated margin for any other reported sale for Hyundai

to represent the margin on these transactions." PDM at 10. Commerce determined preliminary

dumping margins for Hyundai and POSCO of 36.59 percent and 2.78 percent, respectively.

Moreover, Commerce determined a preliminary estimated all-others rate[19] for the non-examined companies, including Company A, Hyundai's affiliated freight company, of 11.68 percent. *See* Preliminary Results, 83 Fed. Reg. at 51,662.

After Commerce published the Preliminary Results, the parties submitted administrative case briefs. In its brief, Hyundai objected to the use of facts available arguing, *inter alia*, that it had provided the information Commerce requested and explained the manner in which it had responded to the agency's requests for information, in accordance with its instructions. *See* Hyundai's Case Br. (Nov. 20, 2018), P.R. 180 at 2 ("There is no information missing from the record for purposes of calculating Hyundai Steel's dumping margin.").

Hyundai also objected to the use of adverse inferences, arguing it complied to the best of its ability, volunteering even more information than Commerce asked for. *See* Hyundai's Case Br. at 9, 12-13. Additionally, Hyundai challenged the sufficiency of the Department's notice of deficiency under § 1677m(d), and the breadth of the Department's use of adverse facts available to all sales under certain CONNUMs, irrespective of whether individual sales under each of those CONNUMs were impacted by the alleged deficiency. *See* Hyundai's Case Br. at 21.

On separate grounds U.S. Steel also questioned the Preliminary Results. In response to the preliminary estimated all-others rate of 11.68 percent that Commerce determined for the non-examined companies, including Company A, U.S. Steel asked Commerce, for the first time in its administrative case brief, to rescind the review with respect to Company A, or in the alternative, to collapse Company A and Hyundai. *See* U.S. Steel's Case Br. (Nov. 20, 2018), C.R., 342, P.R.

---

[19]       The estimated all-others rate is "an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under [19 U.S.C. § 1677e]." *See* 19 U.S.C. § 1673d(c)(5)(A).

178 at 2-3. This rescission request was made well after the regulatory deadline, *i.e.*, more than

ninety days after the date on which the notice of initiation of the review was published in the

Federal Register. *See* 19 C.F.R. § 351.213(d)(1). Specifically, the request was made on November

20, 2018, approximately one year after the publication of the notice of initiation on November 13,

2017.

### B.      Final Results

On May 17, 2019, Commerce published the Final Results. There, the Department

continued to find, as it had in the Preliminary Results, that the use of adverse facts available was

warranted with respect to some of Hyundai's U.S. sales, because it failed "to properly report

consistent product specification information for the U.S. CONNUMs." Final IDM at 13. For

Commerce, Hyundai's "inconsistent reporting of product specification information preclude[d]

Commerce from accurately determining normal value, because Commerce [could not] match the

U.S. sales of these CONNUMs to the appropriate sales in Hyundai's home market database." Final

IDM at 13. Although Hyundai had explained, in its initial Section C questionnaire response, the

differences, and reconciled the reported data with the source documentation, Commerce found that

the differences precluded the determination of normal value because "it [was] unduly difficult for

Commerce to determine the proper specification for an accurate match." Final IDM at 15.

Commerce further found that "[b]ecause [it] [was] unable to determine an appropriate match, and

Hyundai did not provide the necessary information despite two requests to do so, we continue to

determine that Hyundai's failure to report consistent product specification information constitutes

a failure by Hyundai to cooperate to the best of its ability, pursuant to [19 U.S.C. § 1677e(b)]."

Final IDM at 15.

Thus, Commerce determined a weighted-average dumping margin for Hyundai based on adverse facts available of 36.59 percent, and a weighted-average dumping margin of 2.68 percent for POSCO/PDW. *See* Final Results, 84 Fed. Reg. at 24,084. As neither rate was zero, de minimis, or based entirely on facts available, Commerce weight-averaged the two rates to determine the "all-others" rate, *i.e.*, the rate to apply to companies not individually examined, of 11.60 percent. *See id.*; *see also* 19 U.S.C. § 1673d(c)(5)(A).

Also, in the Final Results, Commerce assigned Company A the 11.60 percent all-others rate:

> Consistent with our normal practice, we continue to find it appropriate to calculate the rate for the companies not selected for individual examination in this administrative review (*including Hyundai's affiliated freight company*) based on [19 U.S.C. § 1673d(c)(5)(A)]. Thus, we continue to assign to the companies not individually examined a margin equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely on the basis of facts available.

Final IDM at 26 (emphasis added). In doing so, the Department rejected U.S. Steel's request to rescind the review with respect to Company A as untimely:

> Because the petitioners [including U.S. Steel] did not file a timely request to rescind the review with respect to Hyundai's affiliated freight company [*i.e.*, Company A,] and only requested to withdraw the review for that company in its administrative case brief, well after Commerce had issued its *Preliminary Results*, we find that it is not appropriate to rescind the review for that company at such a late stage of the administrative review.

Final IDM at 27. Moreover, the Department declined to collapse Company A, based on the record evidence showing that it was neither a producer nor an exporter of subject merchandise.[20] By way of explanation, Commerce stated:

---

[20]    Under Commerce's regulations, the agency "will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure

> [B]ased on the record of this review, we agree with both the petitioners and Hyundai
> that the affiliated freight company [Company A] *is neither a producer nor exporter
> of the subject merchandise*. Record evidence identifies the entity in question as
> involved in the transport of raw materials to Hyundai's production facilities and the
> transport of finished cold-rolled steel to domestic customers. However, there is
> nothing on the record which suggests that this entity has the facilities to produce or
> sell the subject merchandise. Moreover, we note that Commerce relies on the
> totality of the circumstances in deciding when to treat affiliated parties as a single
> entity, pursuant to 19 CFR 351.401(f). In this case, because the affiliated freight
> company is involved in transportation and is not a producer or exporter, we find
> that it would not be appropriate to collapse this company with Hyundai, regardless
> of the remaining collapsing criteria.

Final IDM at 27 (emphasis added). Hyundai and U.S. Steel timely commenced their respective

lawsuits to challenge Commerce's use of adverse facts available, its decision to apply the all-others

rate to Company A, and its denial of U.S. Steel's request to rescind the review with respect to

Company A or, in the alternative, to collapse Company A.


## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).


## LEGAL FRAMEWORK

### I.     Statutory Prerequisite to Use of Facts Available: Notice and Opportunity to Remedy

The "basic purpose" of the antidumping statute is to "determin[e] current margins as

accurately as possible." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir.

1990). The burden of creating the administrative record lies with the interested parties; through

---

manufacturing priorities and the Secretary concludes that there is a significant potential for the
manipulation of price or production." 19 C.F.R. § 351.401(f)(1).

questionnaires, Commerce asks for the information that it deems necessary to make its margin determinations. *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1295 (Fed. Cir. 2019) (quoting *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337 (Fed. Cir. 2016)).

The statute provides that, if "necessary information is not available on the record, or . . . an interested party or any other person . . . withholds information that has been requested by [Commerce]" or "significantly impedes a proceeding," Commerce shall use "facts otherwise available" in reaching a determination. *See* 19 U.S.C. § 1677e(a)(1)-(2)(A), (C). Where Commerce has determined that the use of facts available is warranted, it may apply adverse inferences to the facts available if it makes the requisite additional finding that an "interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." *Id.* § 1677e(b)(1). "To the best of its ability" means "one's maximum effort." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Before Commerce may use facts available, however, it must comply with the notice and remedial requirements of § 1677m(d). *See* 19 U.S.C. § 1677e(a) (emphasis added) (Commerce "shall, *subject to section 1677m(d) of this title*, use the facts otherwise available in reaching the applicable determination under this subtitle."); *see also Hyundai Steel Co. v. United States*, 42 CIT __, __, 319 F. Supp. 3d 1327, 1334 n.3 (2018) (citation omitted) ("Section 1677m(d) provides the procedures Commerce must follow when a party files a deficient submission."). This section provides that, if Commerce finds a deficiency in a response to its request for information, it "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d). If the remedial response or explanation is found unsatisfactory

or untimely, the Department may, subject to § 1677m(e),[21] "disregard all or part of the original

and subsequent responses" in favor of facts available. *Id.*

The failure by Commerce to provide a respondent with the statutorily required notice of a

deficiency in its questionnaire response "can render the decision [to apply facts available]

'unsupported by substantial evidence and otherwise contrary to law.'" *Ta Chen Stainless Steel*

*Pipe v. United States*, 23 CIT 804, 819 (1999) (not reported in Federal Supplement) (quoting

*Usinor Sacilor v. United States*, 19 CIT 711, 745, 893 F. Supp. 1112, 1141-42 (1995), *aff'd in part*

*and rev'd in part*, 215 F.3d 1350 tbl. (Fed. Cir. 1999)).

Broadly drawn initial or supplemental questionnaires may not sufficiently place a

respondent on notice of the nature of the deficiency, and deprive it of the opportunity to remedy

that deficiency. *See, e.g.*, *Usinor*, 19 CIT at 744-45, 893 F. Supp. at 1141-42 (finding, in a subsidy

case, that the Department's broadly drawn initial questionnaires did not "discharge [Commerce]

from its obligation to put parties on notice as to the deficiencies in their responses" with respect to

the effect of the subsidies, when the questionnaire did not seek information on the issue of tying);

---

[21]     This section provides:

   In reaching a determination under . . . this title [Commerce] . . . *shall not decline to*
   *consider* information that is submitted by an interested party and is necessary to the
   determination but does not meet all the applicable requirements established by
   [Commerce] . . . if—

   (1) the information is submitted by the deadline established for its submission,
   (2) the information can be verified,
   (3) the information is not so incomplete that it cannot serve as a reliable basis for
   reaching the applicable determination,
   (4) the interested party has demonstrated that it acted to the best of its ability in
   providing the information and meeting the requirements established by the
   administering authority . . . with respect to the information, and
   (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e) (emphasis added).

*Ta Chen*, 23 CIT at 820 (quoting *Böwe–Passat v. United States*, 17 CIT 335, 343 (1993) (not reported in Federal Supplement) (stating that this Court would not endorse "an investigation where [Commerce] sent out a general questionnaire and a brief deficiency letter, then effectively retreated into its bureaucratic shell, poised to penalize [respondent] for deficiencies not specified in the letter that [Commerce] would only disclose after it was too late, *i.e.*, after the preliminary determination.").

Courts have found that Commerce satisfies its obligation under § 1677m(d) to place the respondent on notice of the nature of a deficiency in its initial questionnaire response where a supplemental questionnaire "specifically point[s] out and request[s] clarification of [the] deficient responses," and identifies the information needed to make the required showing. *See NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007) (holding that "Commerce . . . satisfied its obligations under section 1677m(d) when it issued a supplemental questionnaire specifically pointing out and requesting clarification of [the] deficient responses."); *Hyundai Steel*, 42 CIT at __, 319 F. Supp. 3d at 1346 ("Commerce's supplemental questionnaire notified Plaintiff that its initial submissions were insufficient to demonstrate the arm's length nature of the transactions and identified the information it needed to make that showing.").

## II.    Regulations on Rescinding Review and Collapsing Affiliated Companies

Commerce's regulations set out the circumstances in which an administrative review may be rescinded, and applicable time limitations. *See* 19 C.F.R. § 351.213(d). Where the party that requested the review timely withdraws that request, Commerce will rescind the review:

> The Secretary will rescind an administrative review under this section, in whole or in part, if a party that requested a review withdraws the request within 90 days of the date of publication of notice of initiation of the requested review. The Secretary may extend this time limit if the Secretary decides that it is reasonable to do so.

*Id.* § 351.213(d)(1). Additionally, Commerce may rescind a review where it self-initiated the

proceedings, or where the Department concludes "that, during the period covered by the review,

there were no entries, exports, or sales of the subject merchandise, as the case may be." *Id.*

§ 351.213(d)(2), (3).

Collapsing means treating affiliated producers as one entity, and assigning the collapsed

entity a single rate. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,345

(Dep't Commerce May 19, 1997) (Preamble). Commerce's regulations incorporate by reference

the definition of "affiliated persons" in 19 U.S.C. § 1677(33).[22] *See* 19 C.F.R. § 351.102(b)(3).

---

[22]      The statute provides that the following persons "shall be considered to be
'affiliated' or 'affiliated persons'":

> (A) Members of a family, including brothers and sisters (whether by the whole or
> half blood), spouse, ancestors, and lineal descendants.

> (B) Any officer or director of an organization and such organization.

> (C) Partners.

> (D) Employer and employee.

> (E) Any person directly or indirectly owning, controlling, or holding with power to
> vote, 5 percent or more of the outstanding voting stock or shares of any organization
> and such organization.

> (F) Two or more persons directly or indirectly controlling, controlled by, or under
> common control with, any person.

> (G) Any person who controls any other person and such other person.

> For purposes of this paragraph, a person shall be considered to control another
> person if the person is legally or operationally in a position to exercise restraint or
> direction over the other person.

19 U.S.C. § 1677(33). Additionally, Commerce's regulations provide with respect to "control":

> In determining whether control over another person exists, within the meaning of
> [§ 1677(33)], the Secretary will consider the following factors, among others:

Mere affiliation, however, is not enough. Commerce will collapse "affiliated producers [into] a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the [Department] concludes that there is a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1); *see also Carpenter Tech. Corp. v. United States*, 510 F.3d 1370, 1373 (Fed. Cir. 2007) (observing that the "principal authority governing collapsing is 19 C.F.R. § 351.401(f)").

The Department considers a number of factors when assessing "[s]ignificant potential for manipulation," including (1) the level of common ownership; (2) the extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and (3) whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers. 19 C.F.R. § 351.401(f)(2).

---

Corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships. The Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product. The Secretary will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control.

19 C.F.R. § 351.102(b)(3).

**DISCUSSION**

I.      **Commerce's Use of Facts Available Is Neither Supported by Substantial Evidence Nor in Accordance with Law**

In the Final Results, the Department found that the use of facts available was warranted with respect to some of Hyundai's U.S. sales because it failed "to properly report consistent product specification information for the U.S. CONNUMs." Final IDM at 13. For Commerce, Hyundai's "inconsistent reporting of product specification information preclude[d] Commerce from accurately determining normal value, because Commerce [could not] match the U.S. sales of these CONNUMs to the appropriate sales in Hyundai's home market database." Final IDM at 13. Although Hyundai had explained the differences in specification data for products reported "as produced" and "as sold," and reconciled the reported data with the source documentation in its responses, Commerce found that the differences precluded the determination of normal value because "it [was] unduly difficult for Commerce to determine the proper specification for an accurate match." Final IDM at 15.

Based on the same facts cited in support of its use of facts available, the Department further found that the use of an adverse inference was warranted, stating that Hyundai had failed to cooperate with Commerce's requests for information to the best of its ability: "Because Commerce [was] unable to determine an appropriate match, and Hyundai did not provide the necessary information despite two requests to do so, we continue to determine that Hyundai's failure to report consistent product specification information constitutes a failure by Hyundai to cooperate to the best of its ability, pursuant to [19 U.S.C. § 1677e(b)]." Final IDM at 15.

In making its facts available finding, Commerce rejected Hyundai's argument that the Department had failed to discharge its statutory obligation under § 1677m(d) to provide notice of

the nature of the deficiency and an opportunity to correct or explain it. Commerce found that

Hyundai had received notice through its Initial and Supplemental Questionnaires:

> In the initial [antidumping] questionnaire, Commerce instructed Hyundai to report product specification information for each CONNUM that Hyundai sold in the United States. Additionally, Commerce instructed Hyundai in its June 18, 2018, supplemental questionnaire to ensure that it had accurately reported all product specifications, and to revise its response as necessary. Thus, despite the arguments raised by Hyundai about having insufficient notice of deficiencies, we find that the initial [antidumping] questionnaire and Commerce's June 18, 2018, supplemental questionnaire provided Hyundai with two opportunities to provide accurate and consistent product specification information. Specifically, the June 18, 2018, supplemental questionnaire requested that Hyundai ensure that it accurately reported all product specification information in its sales and cost reporting and afforded Hyundai an opportunity to remedy deficiencies that existed in its reporting of product specification information in its original questionnaire responses. Thus, we continue to find that Hyundai failed to correct this reporting error despite the opportunity afforded Hyundai in our June 18, 2018, supplemental questionnaire to remedy this deficiency.

Final IDM at 13-14. Additionally, Commerce argued that its application of adverse facts available

"to sales for which Hyundai provided inconsistent product specifications is consistent with the

analysis of those sales" in the investigation segment—an application of adverse facts available that

was ultimately upheld by this Court. Final IDM at 14.

Hyundai maintains that Commerce's use of facts available in the Final Results based on

uncured "deficiencies" in its reporting cannot be sustained. It insists that its reporting was accurate,

but to the extent Commerce found any problem with the data or the manner in which it was

reported, Commerce failed to notify Hyundai and "afford [it] a reasonable opportunity to remedy

or explain any perceived deficiency":

> Commerce in this proceeding only issued a single supplemental questionnaire, with only vague references to the information Commerce later determined to be deficient. As a matter of law, Commerce is therefore barred from resorting to [facts available or adverse facts available], as the agency did not afford [Hyundai] the procedural safeguards required by the statute.

Hyundai's Br. 9-10. For Hyundai, "[t]he Court should remand the Final Results, with instructions

to calculate [Hyundai]'s margin without the application of facts available, adverse or otherwise,

as Commerce's determination is both unsupported by substantial evidence and contrary to law."

Hyundai's Br. at 12.

     For its part, Commerce argues that it complied with § 1677m(d)'s notice and remedial

requirements:

> Commerce "instructed Hyundai to report product specification information for each
> CONNUM that Hyundai sold in the United States." . . . Hyundai responded to
> Commerce's initial questionnaire but failed to report consistent product
> specification information for all of its sales. . . . Consequently, in its supplemental
> questionnaire, and consistent with 19 U.S.C. § 1677m(d), Commerce asked
> Hyundai to "ensure that {it} accurately reported all product specifications in {its}
> sales and cost reporting." . . . Commerce also indicated that Hyundai should "revise
> {its} response as necessary." . . . Thus, Commerce fully satisfied the requirements
> of 19 U.S.C. § 1677m(d), and there is no merit to Hyundai's assertions that
> Commerce failed to notify Hyundai of the "nature of the perceived deficiency." . . .
>
> Despite Commerce's invitation to submit correct and accurate information,
> Hyundai responded that "{n}o revisions are required," and it "reported accurately
> all product specifications in the sales and cost databases . . ." . . . Thus, Hyundai
> declined to correct inconsistent product specification information despite
> Commerce's request that Hyundai ensure that its specification information was
> accurate.

Def.'s Br. 16 (record citations omitted). Thus, for Commerce, its use of not only facts available,

but adverse facts available, was lawful and supported by the record.

     The law requires that Commerce must comply with the notice and remedial requirements

of § 1677m(d) before it may use facts available. *See* 19 U.S.C. § 1677e(a) (noting that Commerce's

use of facts available under § 1677e(a) is "subject to section 1677m(d) of this title"). This section

provides that, if Commerce finds a deficiency in a response to its request for information, it "shall

promptly inform the person submitting the response of the nature of the deficiency and shall, to

the extent practicable, provide that person with an opportunity to remedy or explain the

deficiency." *Id.* § 1677m(d); *see also Hyundai Steel*, 42 CIT at __, 319 F. Supp. 3d at 1334 n.3 ("Section 1677m(d) provides the procedures Commerce must follow when a party files a deficient submission."). Courts have found that Commerce's supplemental questionnaire adequately placed the respondent on notice of the nature of the deficiency in its response, where the questionnaire "specifically point[ed] out and request[ed] clarification of [the] deficient responses," and identified the information needed to make the required showing. *See NSK Ltd.*, 481 F.3d at 1360 n.1; *Hyundai Steel*, 42 CIT at __, 319 F. Supp. 3d at 1346. This standard was not met here.

Commerce's broadly drawn Supplemental Questionnaire did not satisfy the notice requirement in § 1677m(d) because it failed to identify the nature of the alleged "deficiency" in Hyundai's response with any specificity. *See* Supplemental Questionnaire at 6 ("Please ensure that you have accurately reported all product specifications in your sales and cost reporting, including whether or not the merchandise is prime or non-prime. Revise your response as necessary."). It is, as Hyundai insists, "vague." For example, the question says nothing about any error with respect to Hyundai's interpretation of the Initial Questionnaire instructions to report product code on an "as sold" basis, and specification on an "as produced" basis, which Hyundai explained in its Section C responses.

Moreover, the language "including whether or not the merchandise is prime or non-prime" gave no indication as to what Commerce may have found deficient. Whether merchandise is prime or non-prime pertained to field 2.2, "PRIMEU," and not PRODCOD2U (field 1.0) or SPECGRADEU (field 2.3). *See* Hyundai's Br. 6 (citing Hyundai's Sec. C Quest. Resp. at C-12). Rather, Commerce simply asked Hyundai to ensure the "accuracy" of its reporting of "all product specifications" in Hyundai's sales and cost reporting.

It is difficult to see how the word "accuracy" in the Supplemental Questionnaire should have alerted Hyundai that the specification data it provided was somehow "deficient."[23] In any event, Commerce seems to have objected to the method Hyundai applied to report specification data in the PRODCOD and SPECEGRADE fields. It did not say so in the Supplemental Questionnaire, however, but only later in the Preliminary Results. *See* PDM at 9 (emphasis added) ("[A]fter examining the *manner* in which Hyundai reported the product specifications for certain CONNUMs in the United States and home market, we have determined that Hyundai reported inconsistent product specifications in its home market database which is otherwise contradicted by information in Hyundai's U.S. sales database."). The reported data may well have been perfectly accurate (*i.e.*, correct) and yet, according to Commerce, deficient, because in some instances mismatches in the data existed—mismatches that Hyundai had identified and explained in its narrative responses.[24]

Finally, to the extent Commerce argues that its use of adverse facts available in a prior segment (the investigation), which this Court sustained in *Hyundai Steel*, justified its use of adverse facts available in this review, the court is unpersuaded. *See* Final IDM at 14 (citing *Hyundai Steel*, 42 CIT at __, 319 F. Supp. 3d at 1349-53; *Hyundai Steel Co. v. United States*, 43 CIT __, 365 F. Supp. 3d 1294 (2019)). "[E]ach administrative review is a separate segment of an antidumping proceeding and each with its own, unique administrative record." *Shenzhen Xinboda Indus. Co. v. United States*, 44 CIT __, __, 456 F. Supp. 3d 1272, 1285 n.22 (2020). The

---

[23]      Accuracy means "freedom from mistake or error : CORRECTNESS." *Accuracy*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/accuracy (last visited this date).

[24]      Indeed, after checking its reported specification data, unaware that it was the method with which Commerce took issue, Hyundai responded that its reporting was accurate.

investigation record before the Court in *Hyundai Steel* contained facts not present here. There, unlike in this case, Hyundai was provided with notice of specific deficiencies in its data reporting that were discovered at verification and was afforded an opportunity to explain them. *See Hyundai Steel*, 42 CIT at __, 319 F. Supp. 3d at 1354. Hyundai, however, was unable to do so. Thus, this Court held that "Commerce complied with the requirements of section 1677m(d)." *Id.*

Commerce knew what it was looking for when it issued the Supplemental Questionnaire. *See* PDM at 9 (emphasis added) ("*After finding discrepancies* with the reported information in Hyundai's original questionnaire response, in our June 18, 2018 supplemental questionnaire, we instructed Hyundai to 'please ensure that you have accurately reported all product specifications in your sales and cost reporting, including whether or not the merchandise is prime or non-prime. Revise your response as necessary.'"). But Commerce only hinted at it in the Supplemental Questionnaire. On this record, by failing to identify in the Supplemental Questionnaire anything in particular about Hyundai's reported specification data that it found lacking, Commerce failed in its duty under § 1677m(d) to give notice of a perceived deficiency and a meaningful opportunity to explain or remedy it. Indeed, Commerce's Supplemental Questionnaire is the type of "brief deficiency letter" that this Court has found inadequate to satisfy its duty under § 1677m(d). *See Ta Chen*, 23 CIT at 820. Here, Commerce "effectively retreated into its bureaucratic shell, poised to penalize [respondent] for deficiencies not specified in the letter that [Commerce] would only disclose after it was too late," *i.e.*, after the Preliminary Results. *Id.*

Additionally, it is worth noting that Commerce found that differences in the reported specification data precluded the determination of normal value, not because necessary data was not placed on the record, but because "it [was] unduly difficult for Commerce to determine the proper specification for an accurate match." Final IDM at 15. Had Commerce given Hyundai

adequate notice of the nature of the deficiency, *i.e.*, that product specification data for some sales was not presented in a way that permitted Commerce to easily match products sold in the home market and those sold in the United States, Hyundai could have attempted to explain or remedy the alleged deficiency and eliminate the claimed undue difficulty. But Commerce chose not to give adequate notice.

Because the Department's finding that its Initial and Supplemental Questionnaires placed Hyundai on notice of the nature of the perceived deficiency lacks the support of substantial evidence and is otherwise not in accordance with the law, the court remands this matter. On remand, Commerce shall identify with specificity the control numbers and individual U.S. sales with respect to which it found a deficiency in the reported specification data (PRODCOD2U/H and SPECGRADEU/H); clearly describe the nature of each deficiency; and provide Hyundai an opportunity to fix it. Then, Commerce shall reconsider whether the use of facts otherwise available is warranted with respect to any of Hyundai's sales, and adequately explain and support its remand redetermination with substantial evidence.

The court remands on facts available grounds, so it need not reach the issue of whether the Department's adverse inference finding is supported by the record, but Commerce should bear in mind, on remand, that the use of adverse facts available under § 1677e requires two *distinct* findings, each of which must be supported by the record: first, a determination as to whether the use of facts available is warranted, and second, a determination as to whether the respondent did its subjective best to cooperate. *See Nippon Steel Corp.*, 337 F.3d at 1381; *see also Nat'l Nail Corp. v. United States*, 43 CIT __, __, 390 F. Supp. 3d 1356, 1374 (2019) (not reported in Federal Supplement). The two required findings are distinct, and this Court has cautioned Commerce against conflating them. *Nat'l Nail*, 43 CIT at __, 390 F. Supp. 3d at 1374 (citation omitted) ("[T]he

law requires that the record must support a finding that the use of facts available is warranted before Commerce may make the separate, additional finding that an adverse inference is warranted."). If Commerce determines that the use of facts otherwise available is warranted, and it makes the additional, distinct finding that Hyundai failed to cooperate to the best of its ability, it must adequately explain and support each finding with substantial evidence.

II.     **Commerce's Decisions on Rescission and Collapsing Are Supported by Substantial Evidence and Otherwise in Accordance with Law, But Its Assignment of a Rate to Company A Was Contrary to Law**

At the outset of the proceeding, U.S. Steel requested review of sixteen entities, including Company A, Hyundai's affiliated freight company. On November 13, 2017, Commerce published a notice that it had initiated the requested review. Under Commerce's regulations, U.S. Steel could withdraw its request "within 90 days of the date of publication of notice of initiation of the requested review," unless the deadline was extended by Commerce. *See* 19 C.F.R. § 351.213(d)(1).

On November 20, 2018, after the Preliminary Results were published, and well after the regulatory deadline to withdraw its request for review, U.S. Steel argued in its case brief before the agency that Commerce should rescind the review with respect to Company A, or collapse it with Hyundai. Fundamentally, U.S. Steel objected to Company A's receipt of the all-others rate (11.68 percent), as determined in the Preliminary Results.

In the Final Results, Commerce declined to rescind its review of Company A, finding that U.S. Steel had failed to timely request that Commerce do so. *See* Final IDM at 27 ("Because the petitioners [including U.S. Steel] did not file a timely request to rescind the review with respect to Hyundai's affiliated freight company and only requested to withdraw the review for that company in its administrative case brief, well after Commerce had issued its Preliminary Results, we find

that it is not appropriate to rescind the review for that company at such a late stage of the administrative review.").

Then, Commerce went on to assign the 11.60 percent all-others rate to those companies that were not individually examined, including Company A:

> Throughout the course of the administrative review, we limited our examination of respondents, pursuant to [19 U.S.C. § 1677f-1(c)(2)], and selected Hyundai and POSCO/PDW for individual examination as the two exporters or producers accounting for the largest volume of U.S. imports of the subject merchandise. *Consistent with our normal practice, we continue to find it appropriate to calculate the rate for the companies not selected for individual examination in this administrative review (including Hyundai's affiliated freight company) based on [19 U.S.C. § 1673d(c)(5)(A)[25]]*. Thus, we continue to assign to the companies not individually examined a margin equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely on the basis of facts available.

Final IDM at 26 (emphasis added). In other words, Commerce treated Company A like any other non-mandatory respondent, *i.e.*, a company that was not individually examined in the review, and assigned it the all-others rate.

Additionally, Commerce declined to collapse Company A because it was neither a producer nor an exporter. By way of explanation, Commerce stated:

> [B]ased on the record of this review, *we agree with both the petitioners and Hyundai that the affiliated freight company [Company A] is neither a producer nor exporter of the subject merchandise*. Record evidence identifies the entity in question as involved in the transport of raw materials to Hyundai's production facilities and the transport of finished cold-rolled steel to domestic customers. However, *there is nothing on the record which suggests that this entity has the facilities to produce or sell the subject merchandise*. Moreover, we note that Commerce relies on the totality of the circumstances in deciding when to treat affiliated parties as a single entity, pursuant to 19 CFR 351.401(f). In this case, because the affiliated freight company is involved in transportation and is not a

---

[25]      This section provides: "[T]he estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title." 19 U.S.C. § 1673d(c)(5)(A).

> producer or exporter, we find that it would not be appropriate to collapse this
> company with Hyundai, regardless of the remaining collapsing criteria.

Final IDM at 27 (emphasis added). Put another way, Commerce determined that because Company

A, though affiliated with Hyundai, was neither a producer nor an exporter and had no "facilities to

produce or sell the subject merchandise," the criteria in 19 C.F.R. § 351.401(f)(1) could not be

met. That is, it was not an "affiliated producer[]" that had "production facilities for similar or

identical products that would not require substantial retooling . . . in order to restructure

manufacturing priorities," nor did Commerce "conclude[] that there is a significant potential for

the manipulation of price or production." 19 C.F.R. § 351.401(f)(1). The Department found that

collapsing was, thus, unwarranted.

As to rescission, U.S. Steel does not dispute that as the party that requested the review of

Company A, it was authorized under Commerce's regulations to withdraw the request, *i.e.*, to ask

Commerce to rescind the review, within a certain time limit. Nor does it argue that that its request

to rescind was timely. Rather, U.S. Steel argues that Commerce's assignment of the all-others rate

to Company A is contrary to the antidumping statute because the statute authorizes Commerce to

determine an antidumping margin solely for a producer or exporter of the subject merchandise, not

a freight company:

> Commerce's interpretation [of the statute] is unreasonable because there is no
> statutory provision that would permit Commerce to assign an [antidumping] margin
> to an entity that is neither a producer nor an exporter. Moreover, Commerce's
> interpretation would permit circumvention of high [antidumping] rates by affiliates
> that receive lower cash deposit rates simply because they neither produced nor
> exported during the period of review.

U.S. Steel's Br. 7. In other words, for U.S. Steel, notwithstanding the lateness of its request,

Commerce should have rescinded the review of Company A because assigning the all-others rate

to a company that was neither a producer nor an exporter of subject merchandise was contrary to the statute.

U.S. Steel further contends that Commerce has in prior cases collapsed affiliated entities that were not "producers" of subject merchandise, but were indirectly involved in its production or exportation. U.S. Steel argues that "Commerce has a well-established practice of collapsing producing and non-producing entities if the regulatory criteria establishing a significant potential for manipulation are satisfied and thus, Commerce cannot lawfully ignore this practice without providing a reasoned explanation." U.S. Steel's Br. 7-8. For U.S. Steel, Commerce "never applied its established practice and did not explain why it did not apply the practice in this administrative review." U.S. Steel's Br. 8. Thus, it contends that the Final Results "lack the support of substantial record evidence" because "Commerce failed to engage with the record by erroneously applying its regulation and past practice," and maintains that "[h]ad Commerce applied its practice and regulatory criteria, it would have concluded that there is a substantial likelihood of manipulation of Hyundai Steel's high [antidumping] margin by the affiliated freight company." U.S. Steel's Br. 8.

Taking up collapsing first, Commerce maintains that the determination of whether to collapse is fact-intensive, and that on the record here there was no evidence that Company A was in any way involved in production or had the facilities to produce the subject merchandise. Final IDM at 27. Commerce argues that the past cases in which it collapsed producers with affiliated resellers or distributors are distinguishable because in those cases, unlike here, the affiliates were found to be producers, or to have "administered service centers that manufactured subject merchandise." Def.'s Br. 28-29. Had U.S. Steel placed evidence on the record tending to prove that Company A is a producer or manufacturer, or indeed that it had the capability to become one,

the result might have been different. As the record stands, Commerce's conclusion that the record is insufficiently developed to collapse Company A with Hyundai cannot be faulted, and it is sustained.

Regarding rescission, Commerce states that U.S. Steel requested a review of Company A, and failed to timely withdraw its request. Def.'s Br. 28. Thus, Company A was left in the case among other companies that were not individually examined. In the Preliminary Results, Company A was assigned the all-others rate. Only after the rate was determined did U.S. Steel raise an objection to the review of Company A. For Commerce, it reasonably treated Company A like any other unexamined company and assigned it the all-others rate. Def.'s Br. 27.

The court sustains Commerce's finding that U.S. Steel's request to rescind the review of Company A was untimely. The regulations set out a ninety-day time limit in which a party may withdraw its request for review—a time limit that U.S. Steel was aware of, and complied with, when it withdrew its request for review with respect to several companies *other than* Company A, on February 14, 2018. *See* 19 C.F.R. § 351.213(d)(1). The regulations provide for extensions of time to withdraw the request, but an extension must be requested by the party seeking rescission, and a sound reason for seeking the extension must be provided. *See id.*; *see also Soc Trang Seafood Joint Stock Co. v. United States*, 42 CIT __, __, 321 F. Supp. 3d 1329, 1345 (2018) (although requests to review a mandatory respondent were withdrawn more than ninety days after the publication of the notice of initiation of the review, Commerce granted extension where the requesting parties explained they "could not foresee the need to rescind in the first 90–days of this review and that a rescission of the review would aid in implementation" of a WTO settlement agreement entered into by the United States and Socialist Republic of Vietnam). Here, U.S. Steel

did not request an extension of time to withdraw its request for review. Having failed to request an extension U.S. Steel did not satisfy the prerequisites for asking that a review be rescinded.

Nonetheless, the court finds convincing U.S. Steel's statutory argument that assigning the all-others rate to a non-producer or exporter violated the antidumping statute. Commerce has the authority to determine antidumping duties for "exporters and producers." *See, e.g.*, 19 U.S.C. § 1673b(d)(1)(A) (emphasis added) ("If the preliminary determination of [the Department] under subsection (b) of this section is affirmative, [Commerce] . . . shall . . . determine an estimated weighted average dumping margin for each *exporter and producer* individually investigated, and . . . determine, in accordance with section 1673d(c)(5) of this title, an estimated all-others rate for all exporters and producers not individually investigated . . . ."); *id.* § 1673d(c)(1)(B)(i)(I) (emphasis added) (Commerce "shall . . . determine the estimated weighted average dumping margin for each *exporter and producer* individually investigated"); *id.* § 1677f-1(c)(1) (emphasis added) ("In determining weighted average dumping margins under section 1673b(d), 1673d(c), or 1675(a) of this title, [Commerce] shall determine the individual weighted average dumping margin for each known *exporter and producer* of the subject merchandise."); *id.* § 1673d(c)(5)(B) (emphasis added) (defining the "estimated all-others rate" as the rate "for *exporters and producers* not individually investigated").

Commerce relies on domestic interested parties to identify "individual *exporters or producers* covered by an order" for review, and to withdraw the request within prescribed time limits. *See* 19 C.F.R. § 351.213(b)(1) (emphasis added) ("Each year during the anniversary month of the publication of an antidumping or countervailing duty order, a domestic interested party or an interested party . . . may request in writing that the Secretary conduct an administrative review . . . of specified individual *exporters or producers* covered by an order (except for a

countervailing duty order in which the investigation or prior administrative review was conducted on an aggregate basis), if the requesting person states why the person desires the Secretary to review those particular exporters or producers."); *id.* § 351.213(d)(1). Here, U.S. Steel identified Company A as an exporter or producer. *See* Pet'rs' Request for Admin. Rev. at 2.

Although Commerce relied on U.S. Steel to identify exporters and producers—and in the usual case would have been entitled to do so—once it found that Company A was neither one, it need not have waited for U.S. Steel to ask for rescission to find that it could not determine a rate for Company A. *See* Final IDM at 27 ("[B]ased on the record of this review, we agree with both the petitioners and Hyundai that the affiliated freight company [Company A] is neither a producer nor exporter of the subject merchandise. Record evidence identifies the entity in question as involved in the transport of raw materials to Hyundai's production facilities and the transport of finished cold-rolled steel to domestic customers. . . . [T]here is nothing on the record which suggests that this entity has the facilities to produce or sell the subject merchandise."). The statute authorizes Commerce to determine antidumping duty rates only for producers and exporters. 19 U.S.C. § 1673b(d)(1)(A) (emphasis added) ("If the preliminary determination of [the Department] under subsection (b) of this section is affirmative, [Commerce] . . . shall . . . determine an estimated weighted average dumping margin for each *exporter and producer* individually investigated . . . ."); *see also id.* § 1673d(c)(1)(B)(i)(I). It does not empower Commerce to assign a rate to a freight company. Having made this finding, Commerce need not have waited for U.S. Steel to object to decline to determine a rate for Company A. It should have done so on its own initiative.[26]

---

[26]     The court recognizes that Commerce's regulations provide that the Department may rescind an administrative review that it self-initiated. 19 C.F.R. § 351.213(d)(2). It may also rescind a review "in whole or only with respect to a particular exporter or producer, if the Secretary

Because Commerce was not authorized to perform the statutorily impossible act of assigning a rate to Company A, U.S. Steel's untimely rescission is not consequential. What matters is that Commerce's act in assigning a rate to Company A was unlawful and thus a nullity. Accordingly, on remand, Commerce shall rescind its assignment of the all-others rate to Company A because it found that Company A was neither an exporter nor a producer and thus violated the statutory provisions limiting the determination of an antidumping duty rate to those entities.

## CONCLUSION and ORDER

For the foregoing reasons, it is hereby

**ORDERED** that that Department's use of facts available, under 19 U.S.C. § 1677e(a) based on Hyundai's alleged "withholding" of requested information, is remanded for the agency to comply with its obligation, under 19 U.S.C. § 1677m(d), to notify Hyundai of the nature of the alleged deficiency(ies) in Hyundai's questionnaire responses and provide the company an opportunity to remediate; it is further

**ORDERED** that, on remand, Commerce shall (1) identify with specificity the control numbers and individual U.S. sales with respect to which it found a deficiency in Hyundai's reported specification data (PRODCOD2U/H and SPECGRADEU/H), (2) clearly describe the nature of each deficiency, and (3) provide Hyundai an opportunity to remediate it; it is further

**ORDERED** that, on remand, Commerce shall reconsider whether the use of facts otherwise available is warranted with respect to any of Hyundai's sales, and adequately explain and support its remand redetermination with substantial evidence; it is further

---

concludes that, during the period covered by the review, there were no entries, exports, or sales of the subject merchandise, as the case may be." *Id.* § 351.213(d)(3). The court's ruling to rescind the assignment of the all-others rate to Company A is not inconsistent with the regulations.

**ORDERED** that if, on remand, Commerce continues to find that the use of facts available is warranted, and makes the additional, distinct finding that the application of an adverse inference is warranted because Hyundai failed to cooperate "to the best of its ability," under 19 U.S.C. § 1677e(b), then it shall support this finding with substantial evidence; it is further

**ORDERED** that Commerce shall rescind its assignment of the all-others rate to Company A; and it is further

**ORDERED** that Commerce's remand redetermination shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be filed fifteen (15) days following the filing of the comments.

      /s/ Richard K. Eaton     
Richard K. Eaton, Judge

Dated:       April 27, 2021
               New York, New York